# ORIGINAL

FILED IN CLERK'S OFFICE

MAY / 8 2002

LUTHER D. Thomas, Clerk

Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| GRAY MURRAY, SAM RAMSEY, KEN HENSON, MIRIAM LEWIS, AND BUD HARTLEY, Individually and as Representatives of a Class of Certificate Holders of Tri-City Hospital Authority Revenue Certificates,<br>**Plaintiffs**<br>v.<br><br>U.S. BANK TRUST NATIONAL ASSOCIATION, AND SOUTHTRUST BANK (f/k/a SouthTrust Bank, N.A.),<br>**Defendants** | **1 02-CV-1244**<br>CIVIL ACTION NO._____<br><br>COMPLAINT - CLASS ACTION<br><br>**-CAM**<br><br><br><br>WITH JURY DEMAND |

## COMPLAINT FOR VIOLATION OF THE TRUST INDENTURE ACT, BREACH OF CONTRACT, FRAUD AND MISREPRESENTATION, BREACH OF FIDUCIARY DUTIES, NEGLIGENCE, DECLARATORY RELIEF, AND DAMAGES

COME NOW Plaintiffs and for their Complaint state as follows.

1.     This case involves the Plaintiffs' bonds changing from secured to unsecured, events of default occurring without remedies being enforced, and notice requirements being ignored so that the Bondholders never had opportunity to sell their bonds, because of Defendants' failure to protect and extend the security interest and to take action against defaults even though they had that obligation as Master Trustee, accompanied by Defendants' concealment of their lapse of the security interest and of

FORMS RECEIVED
Consent To US Mag. ✓
Pretrial Instructions _____
Title VII NTC _____
K. Adams

their ignoring events of default until that was revealed in the bankruptcy of the hospital. As a result, the Plaintiffs have lost 70% of the value of their bonds, and interest.

## PARTIES

2.     Plaintiff Gray Murray sues as trustee of the Edward Murray Trust on its behalf, and as a representative of the class of Bondholders (also called certificate holders).    The Edward Murray Trust owns $30,000 of Tri-City Hospital Authority revenue certificates ("the Bonds"), which it purchased on or about May 29, 1998, and which have lost their secured status.

3.     Plaintiff Sam Ramsey sues individually, and as a representative of the class of Bondholders.  He owns $15,000 of the Bonds, which he purchased in 1993, and which have lost their secured status.

4.     Plaintiff Ken Henson sues individually, and as a representative of the class of Bondholders.  He owns $10,000 of the Bonds, which he purchased on or about August 28, 1996, and which have lost their secured status.

5.     Plaintiff Miriam Lewis sues individually, and as a representative of the class of Bondholders.  She owns $15,000 of the Bonds, which she purchased on or about June 15, 1995, and which have lost their secured status.

6.     Plaintiff Bud Hartley sues individually, and as a representative of the class of Bondholders.  He owns $25,000 of the Bonds, which he purchased on or about March

2, 1998, and which have lost their secured status.

7.    Defendant U.S. Bank Trust National Association ("U.S. Bank Trust") is a national banking association, which was the Master Trustee for the Bonds from on or about November 11, 1999 through present, and which did not send notice of a default of the Bond issue and concealed defaults until after the Bond issuer filed for bankruptcy on April 26, 2000. Its "principal place of business [is] in Fulton County, Georgia," according to its complaint filed in Fulton County Superior Court on September 10, 2001 (seeking to determine that SouthTrust Bank and Reliance Trust Company are liable for the Bondholders' loss of secured status). U.S. Bank Trust is a citizen of Minnesota (pursuant to 28 U.S.C. § 1348), resides in Georgia, and may be served on its Georgia registered agent or pursuant to 15 U.S.C. § 77v(a) (and Section 22(a) incorporated therein) by service "in any other district . . . wherever the defendant may be found" by service on it at U.S. Bank Trust National Association, 4th Floor, 180 East Fifth Street, St. Paul, Minnesota 55101.

8.    Defendant SouthTrust Bank ("SouthTrust")(f/k/a SouthTrust Bank, N.A.) is a national banking association, which was the Master Trustee for the Bonds from on or about October 28, 1996 through on or about November 4, 1999, and which did not send notice of a default of the Bond issue and concealed defaults until after the Bond issuer filed for bankruptcy on April 26, 2000. Its "principal place of business [is] in

Birmingham, Alabama" but is "doing business in Fulton County, Georgia," according to

its answer filed in Fulton County Superior Court on November 29, 2001 (arguing that

U.S. Bank Trust and Reliance Trust Company are liable for the Bondholders' loss of

secured status).  SouthTrust is a citizen of Alabama (pursuant to 28 U.S.C. § 1348),

resides in Georgia, and may be served by service on its Georgia registered agent, Mary

Ellen Franklin, at 600 West Peachtree St., 21st Floor, Atlanta, Georgia 30308.

### JURISDICTION AND VENUE

9.    This Court has jurisdiction pursuant to 28 U.S.C. §1331, on the basis of

federal questions under the Trust Indenture Act (15 U.S.C. § 77aaa et seq.), and on the

basis of a suit against a corporation incorporated under an Act of Congress (28 U.S.C. §

1349), and pursuant to 15 U.S.C. § 77v(a), which incorporates the jurisdiction provision

of the Securities Act of 1933 § 22(a) for jurisdiction "in the district wherein the

defendant is found or . . . transacts business," and alternatively pursuant to 28 U.S.C. §

1332, on the basis of diversity between Plaintiffs and Defendants.  The amount in

controversy exceeds $75,000, exclusive of interest and costs.

10.    Venue is proper in this District and this Court pursuant to 28 U.S.C. § 1391,

and pursuant to 28 U.S.C. § 1349 (a suit against a corporation incorporated under an Act

of Congress), and pursuant to 15 U.S.C. § 77v(a) (which incorporates the nationwide

venue provision of the Securities Act of 1933 § 22(a) for venue "in the district wherein

the defendant is found or . . . transacts business"). Defendants are subject to personal jurisdiction in this District.

11.    The Defendants reside in the Northern District of Georgia. All events or omissions giving rise to the claim occurred in the Northern District of Georgia, including the failure to extend the security interest for the Bonds, the failure to give notices of default, the location of the Bond issuer and of most Bondholders, the bankruptcy filing of the Bond issuer, etc.

## CLASS ACTION ALLEGATIONS

### A.    The Rule 23 Test

12.    This class action is brought under Fed. R. Civ. P. 23(b)(1), or in the alternative as stated below under 23(b)(2).

13.    The Class consists of all owners of Tri-City Hospital Authority revenue certificates ("the Bondholders" or the "Certificate holders"), which are further described below. This action seeks to enforce rights for the equal benefit of all Certificate holders, to require the Master Trustee to compensate for the security pledged that was to pay the principal and interest of the Certificate holders, and to hold the Master Trustee liable for its own negligent action and for its fraudulent action.

14.    The class action meets the requirements of Rule 23(a). (1) The Class is so numerous that joinder of all members is impracticable, and includes approximately 1000

Certificate Holders in many different states, on information and belief.

(2) There are questions of law and fact common to the Class, including but not limited to whether Defendants violated the rights of the Class by not filing UCC-3 continuation statements to extend the Class' security interest, by not issuing notices of default to the Debtors and accelerating the Bonds, by not notifying the Class of these failures or of the worsening financial condition of the Debtors, and by concealing the loss of their secured status; whether Defendants violated the Trust Indenture Act, breached a contract toward which the Class are third-party beneficiaries, committed fraud or misrepresentation, breached fiduciary duties, or acted negligently toward the Class; and whether Defendants are liable to the Class for those acts and in what amount.

(3)    The claims of the representative parties are typical of the claims of the Class, in that the representative parties bought the same Bonds, some in the original Bond issue and some thereafter.

(4)    The representative parties will fairly and adequately protect the interests of the Class. They are committed to protect and represent the interests of the Class, have retained legal counsel to do that, have filed a motion in the issuer's bankruptcy action to avoid waiver of the Class' rights, have considered potential causes of action and potential defendants, have reviewed the complaint and various documents in the case, are willing to submit to depositions and court testimony as required, and are typical

Bondholders. Their counsel have investigated the facts, researched the applicable law, assisted in protecting the Class' interests in the issuer's bankruptcy, reviewed the pleadings in the bankruptcy case, reviewed the pleadings in the Fulton action, and prepared a thorough complaint to protect the Class' interests.

15.    The class action meets the requirements of Rule 23(b)(1). (1) The prosecution of separate actions by individual members of the Class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or (B) adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and in the alternative as to the petition to remove the Master Trustee,

(2) The parties opposing the Class have acted or refused to act on grounds generally applicable to the Class, making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

16.    This action does not require a jurisdictional amount.

**B.    The Nonwaiver of Claims**

17.    The bankruptcy trustee did not and does not have standing to assert (and so could not waive) claims of misconduct against an indenture trustee on behalf of the

Bondholders. (*Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972).)

18.    The "Plan [of Reorganization] and Settlement Agreement" could not and did not "effect such a release" of "potential claims of Certificateholders against U.S. Bank for prepetition acts or omissions," as provided in the Confirmation Order in the bankruptcy action. (Order, Findings of Fact, and Conclusions of Law under 11 U.S.C. § 1129 and Fed. R. Bankr. P. 3020 Confirming First Amended Joint Consolidated Liquidating Chapter 11 Plan at ¶ 16 (filed Mar. 22, 2002).)

## FACTS

### A.    The Bondholders' Loss of Secured Status

19.    SouthTrust was the Master Trustee of the Bond issue from the date of its appointment effective October 28, 1996 through the date of appointment of U.S. Bank Trust as its successor Master Trustee effective November 4, 1999. SouthTrust reviewed the Bond issue and the Trust Indenture (as defined below) during the months before the effective date of its appointment, on information and belief.

20.    U.S. Bank Trust was the Master Trustee of the Bond issue from the date of its appointment effective November 4, 1999 through the present. U.S. Bank Trust reviewed the Bond issue and the Trust Indenture (as defined below) during the months before the effective date of its appointment, on information and belief.

21.    The Debtors filed for bankruptcy under Chapter 11 on April 26, 2000. (*In re Georgia International Health Alliance, Inc., et al.*, No. 00-66092 through 00-66096 (N.D.Ga.Bkry filed Apr. 26, 2000) (referred to as the "bankruptcy").

22.    The U.S. Bankruptcy Court held that the Bondholders lost their secured status, and would be treated as unsecured creditors, because of the failure of the Master Trustee to file UCC-3 continuation statements. (Order at 16, *In re Georgia International Health Alliance, Inc., et al.*, Adversary Proceeding No. 00-6200 in No. 00-66092 through 00-66096 (N.D.Ga.Bkry. Aug. 6, 2001)), *aff'd*, No. 01-CV-2610 (N.D.Ga. Apr. 16, 2002).) This was upheld by the U.S. District Court.

23.    The Bankruptcy Court stated correctly that, in fact, "the Defendant [U.S. Bank Trust] concedes that its security interest in the Gross Revenues lapsed due to its failure to file UCC-3 continuation statements." *Id.* at 5.  Thus, Defendant U.S. Trust has admitted that it failed to file UCC-3 continuation statements or new UCC-1 financing statements.  Defendant SouthTrust also failed to file UCC-3 continuation statements.

**B.    The Bond Issue**

24.    The Bonds were issued in connection with South Fulton Medical Center, Inc., which is now known as GIHA Medical, Inc.  Georgia International Health Alliance, Inc. ("GIHA"), GIHA Medical, Inc. (f/k/a South Fulton Medical Center, Inc.) (the "Medical Center"), GIHA Office Building, Inc. (f/k/a South Fulton Medical Arts Center,

Inc.) (the "Arts Center"), GIHA Clinic, Inc. (f/k/a South Fulton Health Care Center, Inc.) (the "Clinics"), and GIHA Cardiology, Inc. (f/k/a South Atlanta Diagnostic Cardiology, Inc.) (the "Cardiology Center"), were the Debtors in bankruptcy and under the Bond issue (hereinafter jointly and severally "Debtors").

25.    The U.S. Bankruptcy Court made the following findings of fact (Paragraphs 26-40 below), which are accurate and are alleged as facts herein (in Order, *id.* at 2-5).

26.    On November 1, 1993, South Fulton Medical Center, Inc. (the "Medical Center") entered into an Asset Purchase Agreement (the "Asset Purchase Agreement") with the Tri-City Hospital Authority (the "Authority") whereby the Authority sold its interest in the hospital located at 1170 Cleveland Avenue, East Point, Fulton County, Georgia (the "Hospital"), including the Gross Revenues (as such term is defined below), to the Medical Center.

27.    In conjunction with the acquisition of the Hospital in 1993, the Medical Center entered into a Loan Agreement (the "Loan Agreement") with the Authority dated as of November 1, 1993, whereby the Authority loaned the Medical Center (the "Loan") the proceeds from the issuance and sale of certain tax-exempt Series 1993 revenue anticipation certificates (the "Revenue Certificates" or the "Bonds"). The Loan was used to finance the acquisition of the Hospital and to finance certain other matters including capital improvements, funding a reserve and paying costs associated with the issuance of

the Revenue Certificates.

28.    In the Loan Agreement, the Authority pledged to Defendants [Master Trustee] its interest in the Loan Agreement and its interest in the Note, if any (as defined below).

29.    On November 1, 1993, Debtors entered into a Master Trust Indenture (the "Master Indenture") among Debtors and the Master Trustee.  The Authority was not a party to the Master Indenture.  Debtors also entered into a First Supplemental Master Trust Indenture (the "Supplemental Indenture") on the same day.  Thus, the Master Indenture, as defined above, is inclusive of the Supplemental Indenture [together called the "Trust Indenture"].

30.    Among other things, the Master Indenture sets forth the terms evidencing the obligation of Debtors to make payments sufficient to pay the principal and interest on the Revenue Certificates issued by the Authority in the original principal amount of $39,140,000.

31.    In connection with the Master Indenture and the Loan Agreement, Debtors executed a promissory note dated as of December 22, 1993 in favor of the Master Trustee in the principal face amount of $39,140,000 (the "Note"), which is the amount necessary to repay the Revenue Certificates.  The Authority was not a party to the Note.

32.    The Revenue Certificates mature at different times and bear interest at several fixed interest rates depending on maturity. The balance due on the Note tracks the balance due on the Revenue Certificates. The outstanding principal owing in respect to the Revenue Certificates and the Note as of the Petition Date was approximately $33,500,000.

33.    Under the Master Indenture, Debtors pledged their Gross Revenues (as such term is defined in the Master Indenture, and generally includes revenues generated by the operations of the Hospital) as collateral to secure Debtors' obligations under the Master Indenture and the Note.

34.    Pursuant to the Master Indenture, Debtors were required to deposit all Gross Revenues into several revenue accounts (collectively, the "Revenue Fund") held by First Union National Bank (f/k/a/ First Union National Bank of Georgia ) ("FUNB") as custodian. . . .

35.    As of the Petition Date, Debtors had only $39,488.36 in the Revenue Fund as is indicated on Debtors' bank statements from FUNB[.]

36.    In the Depository Agreement, FUNB agreed to transfer the balances to the Master Trustee upon request by the Master Trustee following an event of default under the Master Indenture. Under the Depository Agreement, FUNB waives its right of set off or any banker's lien with respect to the monies on deposit in the Revenue Fund.

**C.**    **The Loss of the Bonds' Secured Status on December 22, 1998**

37.    UCC-1 financing statements were originally filed by the Master Trustee for each of the Debtors on or about December 22, 1993 in Fulton County, Georgia covering the Gross Revenues.

38.    As of the Petition Date, no UCC-3 continuation statements with respect to the Gross Revenues had been filed.

39.    Debtors are private, 501(c)(3), not-for-profit corporations as indicated by their corporate documents[.]

**C.**    **The Bankruptcy of the Bond Issuer**

40.    On April 26, 2000 (the "Petition Date"), Debtors filed with [the U.S. Bankruptcy] Court their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Georgia.

41.    The U.S. Bankruptcy Court supervised the Chapter 11 bankruptcy of Debtors until entry of the Confirmation Order on or about March 22, 2002. (Order, Findings of Fact, and Conclusions of Law under 11 U.S.C. § 1129 and Fed. R. Bankr. P. 3020 Confirming First Amended Joint Consolidated Liquidating Chapter 11 Plan (filed Mar. 22, 2002).)

**D.**    **The Failure to Give Notices of Default, To Enforce the Security Interest, To**

**Accelerate the Bond Indebtedness, and To Notify the Bondholders in 1996 through 2000**

42.    The financial condition of the Debtors (whose Gross Revenues the security interest applied to) worsened in 1996, 1997, and 1998 (when a notice of default would have allowed the Master Trustee to enforce the security interest before it was not continued), and continued worsening in 1999 and early 2000 (when a notice of default and acceleration and payment of the Bond indebtedness would have paid the Bondholders more than the 30% that they are expected to receive in the bankruptcy), on information and belief.

43.    "During 1998 and 1999," the Debtors had "losses of between $4 million and $5 million annually." (Disclosure Statement at 12, in *In re Georgia International Health Alliance, Inc., et al.*, No. 00-66092 through 00-66096 (N.D.Ga.Bkry. filed Dec. 20, 2001) (hereinafter "Disclosure Statement").)    During this period, annual Medicare reimbursements were being reduced by $4-5 million annually. (*Id.* at 27.)

44.    The Master Trustee did not send a notice of default, did not demand assurances that the Bonds would be paid, and did not notify the Bondholders of this.

45.    In the fiscal year from July 1, 1998 through June 30, 1999, the Debtors had a net operating loss of $14.7 million, which was a large percentage of gross income. (Disclosure Statement at 20.) As of June 30, 1999, the Debtors were on the verge of

insolvency within 2 months (if they were not already insolvent), because the Debtors had a razor thin net worth of $1.8 million (assets of $71.5 million and liabilities of $69.7 million) according to the bankruptcy trustee. (*Id.*)

46.    The Master Trustee did not send a notice of default, did not demand assurances that the Bonds would be paid, and did not notify the Bondholders of this.

47.    In the six months from July 1, 1999 through December 31, 1999 (just before bankruptcy in April 2000), the Debtors had continuing losses, and did not actually receive a high percentage of the income that they showed as accrued, because the "Debtors went over three (3) months without being able to bill for their services" during that period, which was "devastating to Debtors' cash flow and has drained cash reserves." (Disclosure Statement at 12-13.)

48.    The Master Trustee did not send a notice of default, did not demand assurances that the Bonds would be paid, and did not notify the Bondholders of this.

49.    In the six months from January 1, 2000 through June 30, 2000 (before and after bankruptcy in April 2000), the Debtors had more continuing losses, with a net operating loss of $8.8 million (Disclosure Statement at 20), and were insolvent because assets of $66.3 million were much less than liabilities of $73.3 million. (*Id.*).

50.    The Master Trustee did not send a notice of default, did not demand assurances that the Bonds would be paid, and did not notify the Bondholders of this,

before the bankruptcy was filed.

**E.  The Results of Loss of Secured Status and of Failure to Notice a Default and Accelerate the Bond Indebtedness**

51.  The Bondholders lost their secured status, because of the Master Trustee's failure to file a UCC-3 continuation statement.  Thus, the Bondholders were "treated as an unsecured claim" (Disclosure Statement at 23), and were listed as an unsecured claim (*id.* at 30).  This is correctly stated by the U.S. Bankruptcy Court, and its following holding is incorporated as an allegation of this complaint. (Order at 9-10, *In re Georgia International Health Alliance, Inc., et al.*, Adversary Proceeding No. 00-6200 in No. 00-66092 through 00-66096 (N.D.Ga.Bkry. Aug. 6, 2001).)

52.  "Section 9-302 of the UCC [Uniform Commercial Code] requires a creditor to file a financing statement to perfect its security interest in accounts. Ga. Code Ann. § 11-9-302(1) . . . . Section 9-403(2) of the UCC states that a filed financing statement is effective for a five-year period. Ga. Code Ann. § 11-9-403(2).  Consequently, unless the secured creditor files a timely continuation statement, a financing statement lapses after five years. *Id.*  A lapse causes the creditor's security interest to become unperfected. *Id.* Pursuant to UCC § 9-301(1)(b), "an unperfected security interest is subordinate to the rights of a person who becomes a lien creditor before the security is perfected." *Id.* at § 11-9-301(1)(b). . . . In the Court's view, the analysis mandated by the UCC is quite

-16-

simple. As of the filing date, the Defendant's [U.S. Trust's] security interest in the Gross Revenues was unperfected due to lapse. *Id.* at § 11-9-403(2).    An unperfected security interest is inferior or subordinate to the rights of a lien creditor. *Id.* at § 11-9-301(1)(b). . . . [T]he Debtors have priority over the Defendant as a matter of Georgia law and . . . can avoid the Defendant's security interest as a matter of bankruptcy law. *See* Ga. Code Ann. § 11-9-301(1)(b)."

54.    Because of the loss of the Bondholders' secured status, and the failure to send notice of a default or take action respecting a default during late 1996 through April 2000, the Plan and the bankruptcy trustee told the Bondholders that they would receive only approximately 30% of the face amount of their bonds, and no interest after the bankruptcy filing on April 26, 2002. (Disclosure Statement at 12, 47; *see* First Amended Joint Consolidated Liquidating Chapter 11 Plan  (N.D.Ga.Bkry. Dec. 21, 2001).) Thus, the Bondholders would lose 70% of the face amount of their bonds ($23,450,000), plus all interest after the bankruptcy filing (at 6.375% on the face amount of the Bonds). Even U.S. Bank Trust admits that, in its view, SouthTrust caused the Bondholders to suffer damages "equal to the difference between the value of the Collateral and the amount actually received by the holders of the Revenue Certificates upon a distribution of the bankruptcy estate," which is equal to the amount paid to unsecured creditors and not to the Bondholders, or approximately $5,465,680. (Complaint ¶ 20, *U.S. Bank Trust*

*National Ass'n v. SouthTrust Bank & Reliance Trust Co.*, No. 2001CIV42591 (Fulton Superior Court filed Sep. 10, 2001).)

55.    The Bondholders (a) could have been paid in full had notice of a default been given, and had the Bond indebtedness been accelerated, at any time between December 22, 1996 and the date that the Debtor became insolvent, and they would not have lost any interest. Up to the point of insolvency, the Debtor's assets exceeded its liabilities (including the Bonds), so that assets existed to pay off the Bonds. And had the Bondholders received notice of the loss of their security, they could have sold their Bonds for the face amount, and not lost any interest. (b) Even after the date that the Debtor became insolvent, the Bondholders could have been paid close to 100% of the Bond principal, without losing any interest. (c) But because no notice of default was given, when the bankruptcy was filed $7.5 million or more that should have been paid to the Bondholders was used for operations: "During the first month of Debtors' postpetition operations, Debtors will be required to expend funds in the approximate aggregate amount of $7.5 million to finance various disbursements incurred in the course of operating the business" (Disclosure Statement at 30), in addition to the following amount. (d) And because the Bonds' secured status was lost, approximately $5,465,680 was paid to unsecured creditors other than the Bondholders.

**F.**    **Exhibits**

56.    The following exhibits are attached hereto and incorporated herein:

Exhibit 1.    Trust Indenture (Nov. 1, 1993) between Master Trustee and the Authority

Exhibit 2.    Master Trust Indenture (Nov. 1, 1993) between Master Trustee and Debtors

Exhibit 2A. First Supplemental Master Trust Indenture (Nov. 1, 1993) between Master Trustee and Debtors

(the Trust Indenture, Master Trust Indenture, and First

Supplemental Master Trust Indenture are jointly referred to as

the "Trust Indenture")

Exhibit 3.    Loan Agreement (Nov. 1, 1993) between Debtors and the Authority

Exhibit 4.    Promissory Note and Form of Promissory Note (Nov. 1, 1993) between Debtor and Master Trustee

Exhibit 5.    UCC-1 Financing Statements (perfecting secured status) (Dec. 22, 1993)

Exhibit 6.    Notice of Event of Default (May 12, 2000)

Exhibit 7.    Comptroller of the Currency, Conditional Approval # 397 (May 17, 2000 and June 2000)

Exhibit 8.    Answer of Reliance Trust Co. (Nov. 29, 2001)

Exhibits 1-5 were filed under oath by Defendant U.S. Bank Trust in the U.S. Bankruptcy

Court. (Verified Statement of U.S.Bank Trust National Association as Indenture Trustee,

Exhibits 1-6, in *In re Georgia International Health Alliance, Inc., et al.*, No. 00-66092

through 00-66096 (N.D.Ga.Bkry. filed Sep. 5, 2001).)

## CLAIMS FOR RELIEF

## CAUSE OF ACTION I - VIOLATION OF THE TRUST INDENTURE ACT

44.

57.    The Plaintiffs reallege and incorporate by reference all preceding

paragraphs.

58.    The Bond issue (the Revenue Certificates) was governed by a Trust

Indenture (consisting of the Trust Indenture, the Master Trust Indenture, and the First

Supplemental Master Trust Indenture, Exhibits 1-2A) and accompanying documents

(Exhibits 3-5).

59.    The Trust Indenture was subject to the Trust Indenture Act (15 U.S.C. §

77aaa et seq.).

60.    The Bondholders were the beneficiaries of the Trust Indenture, and were

intended third party beneficiaries, known to the Master Trustees. The Loan Agreement

says that "the registered owners from time to time of the Series 1993 Certificates . . . are intended to be third-party beneficiaries of this Agreement." (Loan Agreement § 9.11 (Exhibit 4).)  The Trust Indenture says that "nothing in this Indenture expressed or implied is intended or shall be construed to confer upon any person, firm or corporation other than the parties hereto and the owners of the Series 1993 Certificates issued under and secured by this Indenture, any right, remedy or claim, legal or equitable, under or by reason of this Indenture . . ., this Indenture . . . being intended to be and being for the sole and exclusive benefit of the parties hereto and the owners of the Series 1993 Certificates." (Trust Indenture § 1301.)  The Master Trust Indenture is similar. (Master Trust Indenture § 12.6.)

61.    This Cause of Action is brought under the private right of action in the Trust Indenture Act (15 U.S.C. § 77ooo; *e.g., Zeffiro v. First Pennsylvania Banking & Trust Co.*, 623 F.2d 290, 299 (3d Cir. 1980); *LNC Inv., Inc. v. First Fidelity Bank, N.A.*, 935 F.Supp. 1333, 1340 (S.D.N.Y. 1996).

62.    It is also brought under the right of the Bondholders as third party beneficiaries to bring this action, under O.C.G.A. § 9-2-20(b) and other provisions: "The beneficiary of a contract made between other parties for his benefit may maintain an action against the promisor on the contract."  It clearly appears from the Trust Indenture and accompanying contracts that they were intended for the Bondholders' benefit, as

described above.

**A.**   **Failure To Preserve Security Interest and To File UCC-3 Continuation Statements, and To Notify the Bondholders of the Loss of Secured Status and To Notice a Default**

63.    The Master Trustee was explicitly or implicitly required by the Trust Indenture to preserve the security interest for the Bonds, which was critical to their value and was the Master Trustee's most important function except disbursing required payments.  The Master Trustee was also explicitly or implicitly required by the Trust Indenture Act to confirm that the security interest was and would continue in force, and to notify the Bondholders if the security interest were lost.    The Master Trustee was required "to pay the [Bond principal and interest] out of the sources pledged" (the security interest) (Trust Indenture § 805), but caused the loss of that security interest, and then concealed it, did not take action for that default, and did not give required notice to the Bondholders.

64.    The Trust Indenture Act requires a Master Trustee to exercise its powers and to fulfill the prudent man standard (§ 77ooo(c)), and makes the Master Trustee liable for its "own negligent action" (§ 77ooo(d)) (as alleged in Causes of Action IV-V).  The Trust Indenture reiterates these requirements (Trust Indenture § 902), and the Loan Agreement denies indemnification for "the Trustee's negligence." (Loan Agreement § 4.03(c).)  A prudent trustee would preserve the security interest, confirm that it was and

would continue in force, and notify the Bondholders if it were lost.

65.    The Trust Indenture also required the Master Trustee to maintain the

secured status of the Bonds (the Series 1993 Certificates):

a.  "Section 704. <u>Recording and Filing</u>. . . .[I]t will cause any financing statements
furnished by the Institution or the Trustee to be kept recorded and filed by the
Trustee in such manner and in such places as the Institution or the Trustee
shall direct in order fully to preserve and protect the security of the owners of
the Series 1993 Certificates and the rights of the Trustee hereunder." (Trust
Indenture § 704.)

b.  "Section 705. <u>Further Instruments and Actions</u>. . . [I]t will execute and deliver
such further instruments or take such further actions as may be required to
carry out the purposes of this Indenture and the Agreement." (Trust Indenture
§ 705.)

c.  "The Series 1993 Certificates issued under this Indenture shall be equally and
ratably secured hereunder." (Trust Indenture § 201.)

d.  The Note must say that it is "secured under the Master Trust Indenture" (Trust
Indenture at 25), and that "[a]s security for the payment of the Series 1993
Certificates" various assets are "pledged to the payment of the principal,
redemption premium (if any) and interest" (*id.* at 25).

e.  "The principal of and interest on the Obligations issued hereunder are secured
by an assignment and pledge of the Trust Estate out of which the same are
payable and are further secured by the lien of this Indenture." (Master Trust
Indenture § 2.1.)

f.  "[M]oneys or investments in any Fund established under the Indenture shall be
trust funds pledged to and held solely for the security and benefit of the
owners of the Series 1993 Certificates . . . ." (Loan Agreement § 3.01(b).)

The bankruptcy trustee agreed in an affidavit that the "Master Trustee was required to

file a UCC-3 continuation statement prior to December 22, 1998 in order to effectively

continue the financing statement." (Aff. of H. Neil Copelan in Support of Chapter 11

Petitions and First Day Orders at 10-11 (Apr. 24, 2000).)

66.    The Trust Indenture made clear that the Bonds were required to have

secured status:

a.  The purpose of the Trust Indenture was "to secure the payment of the Series 1993 Certificates." (Trust Indenture at 2.)

b.  The purpose of the Granting Clauses was "in order to secure the payment of the principal of . . . and the interest on the Series 1993 Certificates," to be "secured"(Trust Indenture at 3), to have "security" and be "equally secured" (*id.* at 4), to be "secured" (*id.* at 5).

c.  "Any and all moneys received by the Authority under the provisions of this Indenture, the Agreement or the Promissory Note shall be deposited as received by the Authority with the Trustee . . . and shall not be subject to any lien or attachment by any creditor of the Authority or the Institution." (Trust Indenture § 601.)

d.  The Granting Clauses of the Master Trust Indenture were "in order to secure the payment of and performance of all Outstanding Obligations" (Master Trust Indenture at 1), since "property which is by the express provisions of this Indenture required to be subject to the lien hereof" (*id.* at 2), "for the equal and proportionate benefit and security of the Holders from time to time of all Obligations" (*id.*), "that all Obligations issued and secured hereunder . . . and all the said property and the rents, revenues and receipts hereby assigned and pledged" (*id.* at 3).

e.  The purpose of the First Supplemental Master Trust Indenture was "in order to secure the payment of the principal of and interest on the Promissory Note . . ., and for the purpose, among others, of further securing the performance and observance of all of the covenants and conditions contained in the Original Master Indenture" (First Supplemental Master Trust Indenture at 2).

f.  The purpose of the Loan Agreement was "to secure the payment of such revenue anticipation certificates" (Loan Agreement at 1).

g. "Whereas, the Series 1993 Certificates shall be secured by the pledge by the Authority to the Trustee of the Trust Estate (as defined in this Indenture), including the payments to be paid by the Institution pursuant to the Promissory Note . . . ." (Loan Agreement at 2.)

h. "[A]ll right, title and interest of the Authority in and to this Agreement and the Promissory Note . . . has been assigned to the Trustee, as security for the Series 1993 Certificates as provided in the Indenture, and that if any Event of Default shall occur, the Trustee shall be entitled to act hereunder in the place and stead of the Authority . . . and may sell or otherwise realize value on the collateral held to secure payment of the Series 1993 Certificates." (Loan Agreement § 7.01.)

i. The Promissory Note was "for the purpose of evidencing and securing the obligations of the Institution under the Loan Agreement" (Note at 2 (Exhibit 4).)

67. The Trust Indenture also required the Master Trustee to notify the Bondholders if security was lost or if another Event of Default occurred:

a. "Section 802. <u>Notice of Default</u>. The Trustee shall, immediately upon an event of default described in Section 801(a) or (b) hereof, and within 30 days after the occurrence of any other event of default, mail to the owners of the Series 1993 Certificates and the Master Trustee notice of all events of default known to the Trustee . . . ." (Trust Indenture § 802.)

b. "Section 7.11. <u>Notice of Default</u>. The Master Trustee shall, immediately upon an Event of Default described in Section 7.1(a)(i) hereof, and within 10 days after the occurrence of any other Event of Default known to the Trustee mail to all Holders of Obligations . . . notice of such Event of Default . . . ." (Master Trust Indenture § 7.11.)

68. The Master Trustees did not protect and extend the security interest, or give notice of a default over its lapse. (a) SouthTrust could and should have filed the UCC-3 continuation statement at any time between June 22, 1998 and December 22, 1998,

thereafter could and should have filed a new UCC-1 financing statement, if it could not then it could and should have given notice of a default and accelerated the Note and the Loan Agreement, and could and should have notified U.S. Bank Trust of the foregoing, but did not. (b) U.S. Bank Trust could and should have confirmed whether the security interest was still in effect, and upon discovering that it was not, could and should have filed a replacement UCC-1 financing statement, and if it could not it could and should have given notice of a default and accelerated the Note and the Loan Agreement, but did not.

69.     The Master Trustees did not notify the Bondholders.  Each Master Trustee was required to notify the Bondholders of the loss of secured status, and of any other default, but did not.

70.     The failure of each Master Trustee to file a UCC-3 continuation statement, or to file a new UCC-1 financing statement, was a direct and proximate cause of the Bondholders' loss of 70% of the face amount of the Bonds, plus interest due since April 26, 2000. The failure of each Master Trustee to notify the Bondholders of the loss of the security interest, so that they would be aware of dangers and would have the opportunity to sell their Bonds, was also a direct and proximate cause of the same.

**B.      Failure To Give Notices of Default, To Enforce the Security Interest, To Accelerate the Bond Indebtedness, and To Notify the Bondholders**

71.    The Master Trustee was explicitly or implicitly required by the Trust Indenture to give notices of default when the Trust Indenture was violated, to accelerate the Bond indebtedness and enforce other remedies, and to notify the Bondholders of a default.

72.    The Trust Indenture Act requires a Master Trustee to send notices of defaults (§ 77ooo(b)), and to exercise its powers and to fulfill the prudent man standard (§ 77ooo(c)), besides making the Master Trustee liable for its "own negligent action" (§ 77ooo(d)) (as alleged in Cause of Action V).  A prudent trustee would give notices of defaults, accelerate the Bond indebtedness upon a default, and notify the Bondholders of a default.

73.    The Trust Indenture required the Master Trustee to take action in event of default:

a.  "If such an event of default shall occur, then in each and every such case . . . (ii) upon the occurrence of an event of default described in Section 801(e) [an event of default in Section 801(e) of the Master Indenture], the Trustee shall, upon receiving indemnity or security satisfactory to it, proceed to protect and enforce its rights and the rights of the owners of the Series 1993 Certificates . . . ." (Trust Indenture § 801.)

b.  "Upon the happening of an event of default, then . . . (ii) upon the occurrence of an event of default described in Section 801(e), the Trustee shall (subject to the next sentence), by notice in writing delivered to the Authority and the Institution, declare the principal of all Series 1993 Certificates then outstanding and the interest accrued thereon to be immediately due and payable. The Trustee shall give notice of any such declaration as soon as practicable to the Master Trustee by telephone or telecopy, promptly

confirmed in writing." (Trust Indenture § 801.)

   c.  The Master Trustee must give written notice of an event of default. (Master Trust Indenture § 7.1(a)(ii).)

   d.  "Upon the occurrence of an Event of Default, then and in each and every such case, the Master Trustee may, by notice in writing to the Obligated Issuers, declare the principal of all (but not less than all) Outstanding Obligations to be due and payable immediately . . .; provided that the Master Trustee shall be required to make such a declaration (i) if an Event of Default has occurred under subsection (a)(i) above, (ii) if an Event of Default has occurred under subsection (a)(ii) above as a result of a default under the Related Financing Documents for any Obligations . . . ." (Master Trust Indenture § 7.1(b).)

   74.   The Trust Indenture also required the Master Trustee to send notice to the Bondholders in event of default:

"Section 802. <u>Notice of Default</u>. The Trustee shall, immediately upon an event of default described in Section 801(a) or (b) hereof, and within 30 days after the occurrence of any other event of default, mail to the owners of the Series 1993 Certificates and the Master Trustee notice of all events of default known to the Trustee . . . ." (Trust Indenture § 802.)

"Section 7.11. <u>Notice of Default</u>. The Master Trustee shall, immediately upon an Event of Default described in Section 7.1(a)(i) hereof, and within 10 days after the occurrence of any other Event of Default known to the Trustee mail to all Holders of Obligations . . . notice of such Event of Default . . . ." (Master Trust Indenture § 7.11.)

   75.   The Master Trustees did not take action against defaults, or accelerate the Bond principal and interest. (a) SouthTrust could and should have given notices of default to the Debtors because of the large losses and apparent insolvency of the Debtor, as well as because of loss of the security interest. (b) U.S. Bank Trust could and should

have given notices of default to the Debtors because of the large losses and apparent insolvency of the Debtor, as well as because of loss of the security interest.

76.    The Master Trustees also did not give notice to the Bondholders of the defaults, the large losses, or the apparent insolvency of the Debtor, until after it was too late when bankruptcy was filed (Exhibit 6).

77.    The failure of each Master Trustee to give notices of default, to enforce the security interest when it could still be enforced, and to accelerate the Bond indebtedness, was a direct and proximate cause of the Bondholders' loss of 70% of the face amount of the Bonds, plus interest due since April 26, 2000. The failure of each Master Trustee to notify the Bondholders of the defaults, the large losses, and possible insolvency, so that they would be aware of dangers and would have the opportunity to sell their Bonds, was also a direct and proximate cause of the same.

**C.    Failure To Send Required Reports to the Bondholders**

78.    The Master Trustee was explicitly or implicitly required by the Trust Indenture Act and the Trust Indenture to send annual reports to the Bondholders.

79.    The Trust Indenture Act requires a Master Trustee to send a report at least every 12 months to the Bondholders (§ 77mmm) and to send additional reports as required (*id.*), and to exercise its powers and to fulfill the prudent man standard (§ 77ooo(c)), as well as to be liable for its "own negligent action" (§ 77ooo(d)) (as alleged

in Cause of Action V). A prudent trustee would give reports of losses of $4-5 million a year which reached $14.7 million in the year ending June 30, 1999 and of the risk of insolvency, as well as notify the Bondholders if the security interest were lost and if any default occurred.

80. The Master Trustees did none of these things. (a) SouthTrust could and should have given reports of losses of $4-5 million a year in 1998 and 1999 which reached $14.7 million in the year ending June 30, 1999 and of the risk of insolvency (it resigned effective November 4, 1999), as well as that it could and should have notified the Bondholders that the security interest was lost and that defaults occurred, but did not on information and belief. (b) U.S. Bank Trust could and should have given reports of prior losses of $4-5 million a year in 1998 and 1999 which reached $14.7 million in the year ending June 30, 1999 and of the risk and actuality of insolvency (which occurred before or just after it became Master Trustee effective November 4, 1999), as well as that it could and should have notified the Bondholders that the security interest was lost and that defaults occurred, but did not on information and belief.

81. The failure of each Master Trustee to send 12 month reports and additional reports to the Bondholders, so that they would be aware of dangers and would have the opportunity to sell their Bonds, was a direct and proximate cause of the Bondholders' loss of 70% of the face amount of the Bonds, plus interest due since April 26, 2000.

**D.**  **Failure To Be Authorized To Serve as Master Trustee, and Failure To Resign Because of a Conflict of Interest, and To Notify the Bondholders; and Petition to Remove and Replace the Trustee**

**1.**  **Failure To Be Authorized To Serve as Master Trustee**

82.    U.S. Bank Trust National Association did not receive "preliminary conditional approval" from the Office of the Comptroller of the Currency, to enable it to "engage solely in fiduciary activities," until on or after May 17, 2000, which only took effect thereafter when it met "requirements that must be met before the bank will be allowed to commence business." (Comptroller of the Currency, Conditional Approval No. 397 (dated May 17, 2000 and June 2000) (attached hereto and incorporated herein as Exhibit 7).

83.    Thus, U.S. Bank Trust was not eligible or authorized to serve as Master Trustee, when it considered appointment, when it was appointed, or at any time before bankruptcy.

84.    The Trust Indenture provided that "[n]o successor Trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor Trustee shall be eligible under the provisions hereof." (Trust Indenture § 910.) U.S. Bank Trust was not eligible.

85.    U.S. Bank Trust did not disclose this to the Plaintiffs or the Class, but instead concealed it.

86.    SouthTrust should have discovered this in the exercise of reasonable diligence and in the exercise of its fiduciary duties, and did not notify the Plaintiffs or the Class.

87.    The named Plaintiffs and the Class hereby ask the Court to determine that U.S. Bank Trust was not authorized to serve as Trustee when it purported to accept that position effective November 4, 1999, or at any time before the bankruptcy filing on April 26, 2000, or at any time before the Office of the Comptroller of the Currency gave it preliminary conditional approval to act on May 17, 2000; and that U.S. Bank Trust is for that reason liable for the damages specified at the end of this complaint, and must disgorge all fees and expenses received in connection with the Bonds, and was not legally able to receive fees and expenses in connection with the Bonds; that SouthTrust never effectively resigned and remained obligated as Master Trustee; and that SouthTrust is liable for either not fulfilling its obligation to inquire and discover the ineligibility of U.S. Bank Trust or knowing of the problem and agreeing to an ineligible replacement and not notifying the Bondholders.

88.    The named Plaintiffs and the Class are security holders who have been bona fide holders of indenture securities for at least six months, and have sent a written request to the Master Trustee for it to comply with the provisions of § 77jjj(b)(i).

89.    The named Plaintiffs and the Class hereby petition for the removal of the Master Trustee and Trustee, and the appointment of a successor, pursuant to the Trust Indenture Act (§ 77jjj(b)(iii)).

2.    **Failure To Resign Because of a Conflict of Interest, and To Notify the Bondholders**

90.    The Trust Indenture Act disqualifies a trustee that "has or shall acquire any conflicting interest" (§ 77jjj(b)), such as if the trustee does not cure a default (§ 77jjj(b)(1)) or if the trustee becomes a creditor (§ 77jjj(b)(10)).

91.    U.S. Bank Trust has not cured defaults, and has admitted that it is a creditor. It is listed as a creditor in bankruptcy court, and said in a verified statement that "U.S. Bank Trust as Indenture Trustee has a claim for fees and expenses under the Bond Indenture and the Master Indenture. . . . " (Verified Statement of U.S. Bank Trust National Association as Indenture Trustee at 5 (Sep. 5, 2001).)

92.    The named Plaintiffs and the Class are security holders who have been bona fide holders of indenture securities for at least six months, and have sent a written request to the Master Trustee for it to comply with the provisions of § 77jjj(b)(i).

93.    The named Plaintiffs and the Class hereby petition for the removal of the Master Trustee and Trustee, and the appointment of a successor, pursuant to the Trust Indenture Act (§ 77jjj(b)(iii)).

## CAUSE OF ACTION II. - BREACH OF CONTRACT

94.   The Plaintiffs reallege and incorporate by reference all preceding paragraphs.

95.   In the alternative to the tort claims in Causes of Action III-V, Defendants breached contracts consisting of the Trust Indenture (Exhibits 1-2A) and the UCC-1 Financing Statements filed in connection with it (Exhibit 5), and the agreements incorporated in the Trust Indenture (Exhibits 3-4), of which the Bondholders were known and foreseeable third party beneficiaries.

96.   The Bondholders were the beneficiaries of the Trust Indenture, and were intended third party beneficiaries, known to the Master Trustees. The Loan Agreement says that "the registered owners from time to time of the Series 1993 Certificates . . . are intended to be third-party beneficiaries of this Agreement." (Loan Agreement § 9.11.) The Trust Indenture says that "nothing in this Indenture expressed or implied is intended or shall be construed to confer upon any person, firm or corporation other than the parties hereto and the owners of the Series 1993 Certificates issued under and secured by this Indenture, any right, remedy or claim, legal or equitable, under or by reason of this Indenture . . ., this Indenture . . . being intended to be and being for the sole and exclusive benefit of the parties hereto and the owners of the Series 1993 Certificates." (Trust Indenture § 1301.) The Master Trust Indenture is similar. (Master Trust Indenture

§ 12.6.)

97.    The Bondholders as third party beneficiaries may bring this action, under O.C.G.A. § 9-2-20(b) and other provisions: "The beneficiary of a contract made between other parties for his benefit may maintain an action against the promisor on the contract." It clearly appears from the Trust Indenture and accompanying contracts that they were intended for the Bondholders' benefit.

**A.    Failure To Preserve the Security Interest and To File UCC-3 Continuation Statements, and To Notify the Bondholders of the Loss of Secured Status and To Notice a Default**

98.    The Master Trustee was explicitly or implicitly required by the Trust Indenture to preserve the security interest for the Bonds, which was critical to their value and was the Master Trustee's most important function except disbursing required payments.  The Master Trustee was also explicitly or implicitly required by the Trust Indenture Act to confirm that the security interest was and would continue in force, and to notify the Bondholders if the security interest were lost.

99.    The Trust Indenture required the Master Trustee to do these things, and the Master Trustee breached those requirements, as stated in paragraphs 65-67 above.

100.    The failure of each Master Trustee to file a UCC-3 continuation statement, or to file a new UCC-1 financing statement, was a direct and proximate cause of the Bondholders' loss of 70% of the face amount of the Bonds, plus interest due since April

26, 2000. The failure of each Master Trustee to notify the Bondholders of the loss of the security interest, so that they would be aware of dangers and would have the opportunity to sell their Bonds, was also a direct and proximate cause of the same.

**B.    Failure To Give Notices of Default, To Enforce the Security Interest, To Accelerate the Bond Indebtedness, and To Notify the Bondholders**

101. The Master Trustee was explicitly or implicitly required by the Trust Indenture to give notices of default when the Trust Indenture was violated, to accelerate the Bond indebtedness and enforce other remedies, and to notify the Bondholders if there were a default.

102. The Trust Indenture required the Master Trustee to do these things, and the Master Trustee breached those requirements, as stated in paragraphs 73-74 above.

103. The failure of each Master Trustee to give notices of default, to enforce the security interest when it could still be enforced, and to accelerate the Bond indebtedness, was a direct and proximate cause of the Bondholders' loss of 70% of the face amount of the Bonds, plus interest due since April 26, 2000. The failure of each Master Trustee to notify the Bondholders of events of default and of serious financial problems of the Debtors, so that they would be aware of dangers and would have the opportunity to sell their Bonds, was also a direct and proximate cause of the same.

**C.    Breach of Covenant of Good Faith and Fair Dealing**

104.   The Master Trustee had an implied covenant of good faith and fair dealing toward the Bondholders, and also toward its duties under the Trust Indenture and under the Trust Indenture Act.

105.   The Master Trustees breached these requirements, by not in good faith or with fair dealing: protecting and extending the security interest, notifying the Bondholders of its loss, giving notice to the Debtors of events of default and accelerating the Note and Loan Agreement, or notifying the Bondholders of events of default and serious financial losses of the Debtors.

106.   The failure of each Master Trustee to fulfill the covenant of good faith and fair dealing in these ways, so that the security interest would be extended, so that events of default and financial problems would result in acceleration of the debt, and so that the Bondholders would be aware of dangers and would have the opportunity to sell their Bonds, was a direct and proximate cause of the Bondholders' loss of 70% of the face amount of the Bonds, plus interest due since April 26, 2000.

### CAUSE OF ACTION III. - FRAUD AND MISREPRESENTATION

**A.    <u>Common Law Fraud Or Intentional Misrepresentation and Statutory Fraud, Misrepresentation, Or Deceit Against Defendants</u>**

107.   The Plaintiffs reallege and incorporate herein by reference all preceding paragraphs.

1.    **By U.S. Bank Trust**

108.  U.S. Bank Trust while Master Trustee actively and intentionally concealed from the Bondholders, or in the alternative recklessly concealed and recklessly failed to disclose to the Bondholders, (i) that it knew from its efforts to acquire Reliance Trust Company (the servicing agent for the prior Master Trustee SouthTrust), and knew or should have known had it not been reckless from its investigation and obligation to protect the Bondholders, that a UCC-3 continuation statement was not filed by December 22, 1998 and that the Bonds' secured status was lost, during the period from the date of its review of Bond issue documents in connection with considering the acquisition of Reliance Trust Co. through its due diligence and the effective date it replaced SouthTrust as Master Trustee on or about November 4, 1999 through the present, and (ii) that it knew from its efforts to acquire Reliance Trust Company (on information and belief), and knew or should have known had it not been reckless from its investigation and obligation to protect the Bondholders, that the Debtors had huge ongoing losses and were or would shortly become insolvent, during the same period, and (iii) that it was not eligible to serve as Master  Trustee and also had a conflict of interest justifying removal, as described in Cause of Action I.D (together the "U.S. Bank Trust Omissions"), on information and belief.  U.S. Bank Trusts' communications to the Bondholders, because of the U.S. Bank Trust Omissions, constituted false representations at the time.  U.S.

Bank Trust had a duty to disclose that information to the Bondholders.

109. U.S. Bank Trust, according to pleadings filed by Reliance Trust Company (the servicing agent for the prior Master Trustee SouthTrust), knew or but for recklessness should have known, that no UCC-3 continuation statement had been filed, and actively concealed that from the Bondholders:

> prior to December 22, 1998, Plaintiff's affiliate U.S. Bank National Association . . . conducted due diligence with respect to its purchase of Reliance's corporate trust services business, from which U.S. Bank [National Association] learned, or should have learned, that (a) no UCC-3s had been filed with respect to the Collateral . . . .

(Answer of Reliance Trust Company ¶ 12 (Nov. 29, 2001), *U.S. Bank Trust National Ass'n v. SouthTrust Bank & Reliance Trust Co.*, No. 2001CIV42591 (Fulton Superior Court filed Sep. 10, 2001) (Exhibit 8).)

110. U.S. Bank Trust did so with the intent to and in a manner as to deceive and mislead the Bondholders, and with the intent to induce the Bondholders to refrain from acting (refrain from suing U.S. Bank Trust and selling their Bonds) to their injury or risk (they lost 70% of the value of their Bonds plus interest due after April 26, 2000). The information consisting of the U.S. Bank Trust Omissions (that the security interest had been lost and that huge losses were occurring and insolvency had occurred or was imminent) was not known at the time by the Plaintiffs to be false, nor could they have been known at the time or before April 16, 2002 by the Plaintiffs to be false by the

reasonable exercise of care.

111.  U.S. Bank Trust knew at the time it made the U.S. Bank Trust Omissions that the information in the U.S. Bank Trust Omissions was actively concealed, and that the concealed information rendered communications to the Bondholders false when made, and U.S. Bank Trust concealed the information in the U.S. Bank Trust Omissions with the intent to and in a manner as to deceive and mislead the Bondholders; or alternatively it omitted and withheld that information with reckless disregard for the truth, on information and belief.

112.  The Bondholders reasonably and justifiably relied upon the U.S. Bank Trust Omissions, to their detriment, harm, risk, and injury, by not suing to accelerate the Bond indebtedness for loss of the security interest or for other defaults, by not suing or petitioning to remove U.S. Bank Trust, and by not selling their Bonds when they could do so for their face amount.  U.S. Bank Trust either possessed or held itself out to possess superior knowledge or special information regarding the information in the U.S. Bank Trust Omissions, and the Bondholders were situated so that they could have reasonably relied upon, and did rely upon, the knowledge, information, or expertise of U.S. Bank Trust with regard to such representations.

113.  As a direct and proximate result of U.S. Bank Trust's wrongful conduct, the Bondholders have been damaged in the amount of at least 70% of the Bond face value,

plus interest due after April 26, 2000.

114. Thus, Defendants actively concealed information (as described above), knowing information given without the U.S. Bank Trust Omissions was false or which they should have known was false, with the intention and purpose of deceiving the Bondholders, who relied on U.S. Bank Trust's representations, and who sustained damages as the direct and proximate result of the active concealment having been made and of the U.S. Bank Trust Omissions.

115. U.S. Bank Trust has acted with willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care which raises the presumption of conscious indifference to consequences, constituting both common law fraud and intentional misrepresentation, and statutory fraud, misrepresentation, or deceit in violation of O.C.G.A. §51-6-1. The Bondholders are therefore entitled to punitive damages, the costs of this action, and attorneys' fees.

**2.    By SouthTrust**

116. SouthTrust while Master Trustee actively and intentionally concealed from the Bondholders, or in the alternative recklessly concealed and recklessly failed to disclose to the Bondholders, (i) that a UCC-3 continuation statement was not filed by December 22, 1998 and that the Bonds' secured status was lost, during the period December 22, 1998 through SouthTrust's replacement on or about November 4, 1999

and thereafter, and (ii) that the Debtors had huge ongoing losses and were or would shortly become insolvent, during the period October 28, 1996 through SouthTrust's replacement on or about November 4, 1999 and thereafter (the "SouthTrust Omissions"), on information and belief. SouthTrusts' communications to the Bondholders, because of the SouthTrust Omissions, constituted false representations at the time. SouthTrust had a duty to disclose that information to the Bondholders.

117.  SouthTrust did so with the intent to induce the Bondholders to refrain from acting (refrain from suing SouthTrust and selling their Bonds) to their injury or risk (they lost 70% of the value of their Bonds plus interest due after April 26, 2000).  The information consisting of the SouthTrust Omissions (that the security interest had been lost and that huge losses were occurring and insolvency had occurred or was imminent) was not known at the time by the Plaintiffs to be false, nor could they have been known at the time or before April 16, 2002 by the Plaintiffs to be false by the reasonable exercise of care.

118.  SouthTrust knew at the time it made the SouthTrust Omissions that the information in the SouthTrust Omissions was actively concealed, and that the concealed information rendered communications to the Bondholders false when made, and SouthTrust concealed the information in the SouthTrust Omissions with the intent to and in a manner as to deceive and mislead the Bondholders; or alternatively it omitted and

withheld that information with reckless disregard for the truth, on information and belief.

119. The Bondholders reasonably and justifiably relied upon the SouthTrust Omissions, to their detriment, harm, risk, and injury, by not suing to accelerate the Bond indebtedness for loss of the security interest or for other defaults, by not suing or petitioning to remove SouthTrust, and by not selling their Bonds when they could do so for their face amount. SouthTrust either possessed or held itself out to possess superior knowledge or special information regarding the information in the SouthTrust Omissions, and the Bondholders were situated so that they could have reasonably relied upon, and did rely upon, the knowledge, information, or expertise of SouthTrust with regard to such representations.

120. As a direct and proximate result of SouthTrust's wrongful conduct, the Bondholders have been damaged in the amount of at least 70% of the Bond face value, plus interest due after April 26, 2000.

121. Thus, Defendants actively concealed information (as described above), knowing information given without the SouthTrust Omissions was false or which they should have known was false, with the intention and purpose of deceiving the Bondholders, who relied on SouthTrust's representations, and who sustained damages as the direct and proximate result of the active concealment having been made and of the SouthTrust Omissions.

122.  SouthTrust has acted with willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care which raises the presumption of conscious indifference to consequences, constituting both common law fraud and intentional misrepresentation, and statutory fraud, misrepresentation, or deceit in violation of O.C.G.A. §51-6-1. The Bondholders are therefore entitled to punitive damages, the costs of this action, and attorneys' fees.

**B.      Fraud By Suppression Of Fact In A Confidential Relationship By Defendants**

123.  U.S. Bank Trust, in addition to the foregoing, suppressed material facts (the U.S. Bank Trust Omissions), which it was under an obligation to communicate.  The obligation to communicate arose from the confidential relation of U.S. Bank Trust as Master Trustee toward the Bondholders, from its fiduciary duties described in Cause of Action IV, from the obligation under the Trust Indenture Act to give annual reports and additional reports to the Bondholders as described in Cause of Action I.C, and from the obligation under that Act and under the Trust Indenture to give notices of defaults to Bondholders promptly as described in Cause of Action I.A-B.  U.S. Bank Trust was so situated as to exercise a controlling influence over the will, conduct, or interest of the Bondholders, and to create a relationship of confidence, and was required to but did not exercise the utmost good faith.  The Plaintiffs reallege and incorporate Cause of Action III.A.

124. SouthTrust, in addition to the foregoing, suppressed material facts (the SouthTrust Omissions), which it was under an obligation to communicate. The obligation to communicate arose from the confidential relation of SouthTrust as Master Trustee toward the Bondholders, from its fiduciary duties described in Cause of Action IV, from the obligation under the Trust Indenture Act to give annual reports and additional reports to the Bondholders as described in Cause of Action I.C, and from the obligation under that Act and under the Trust Indenture to give notices of defaults to Bondholders promptly as described in Cause of Action I.A-B. SouthTrust was so situated as to exercise a controlling influence over the will, conduct, or interest of the Bondholders, and to create a relationship of confidence, and was required to but did not exercise the utmost good faith. The Plaintiffs reallege and incorporate Cause of Action III.A.

### CAUSE OF ACTION IV – BREACH OF FIDUCIARY DUTIES

125. The Plaintiffs reallege and incorporate by reference all preceding paragraphs.

126. Each Master Trustee owed fiduciary duties to the Plaintiffs and the Class. U.S. Bank Trust has admitted that the Master Trustee had the "fiduciary duties to the holders of the Revenue Certificates [Bonds] throughout the entire six month period during which UCC-3 continuation statements could have and should have been filed to

prevent a lapse of the perfected security interest in the Collateral." (Complaint ¶ 22, *U.S. Bank Trust National Ass'n v. SouthTrust Bank & Reliance Trust Co.*, No. 2001CIV42591 (Fulton Superior Court filed Sep. 10, 2001).)

127. Besides the fiduciary duties under state law, the Trust Indenture Act recognizes that a trustee has fiduciary duties, by requiring a trustee to exercise its powers under and to fulfill the prudent man standard (§ 77ooo(c)). The Trust Indenture reiterates these requirements (Trust Indenture § 902).

A.  **Failure To Protect and Continue the Security Interest, To Accelerate the Bond Indebtedness, and To Notify the Bondholders**

128. Defendants violated and breached these fiduciary duties by the acts and omissions described in Causes of Action I-II above, including but not limited to (a) not filing UCC-3 continuation statements, not filing replacement UCC-1 financing statements, not notifying the Debtor of a default because of the lapse of the security interest, not enforcing the Bondholders' remedies including acceleration of the Bonds, and alternatively not investigating and confirming whether the UCC-3 continuation statement had been filed; (b) not notifying the Bondholders of the lapse of the security interest; and (c) concealing the loss of secured status from the Bondholders, including that which U.S. Bank Trust learned before it became Master Trustee in investigating the possible acquisition of Reliance Trust Company and that which SouthTrust knew or

should have known when the security interest lapsed, and sending misleading and false reports to the Bondholders because of the absence of the concealed information. U.S. Bank Trust has admitted that the "failure by SouthTrust and Reliance, as the fiduciary servicing agent for SouthTrust, to file UCC-3 continuation statements was a breach of their fiduciary duties to the holders of the Revenue Certificates and was the direct and proximate cause of the lapse of the perfected security interest in the Collateral and damages to the holders of the Revenue Certificates." (*Id.* ¶ 23.)

129. The failure of each Master Trustee to file a UCC-3 continuation statement, or to file a new UCC-1 financing statement, and to take steps to accelerate the Bond principal, was a direct and proximate cause of the Bondholders' loss of 70% of the face amount of the Bonds, plus interest due since April 26, 2000. The failure of each Master Trustee to notify the Bondholders of the loss of the security interest, so that they would be aware of dangers and would have the opportunity to sell their Bonds, was also a direct and proximate cause of the same.

**B.**   **Failure To Give Notices of Default, To Enforce the Security Interest, To Accelerate the Bond Indebtedness, and To Notify the Bondholders**

130. Defendants violated and breached these fiduciary duties by the acts and omissions described in Causes of Action I-II above, including but not limited to (a) not notifying the Debtor of a default arising from the large losses and insolvency of the

Debtor, and not enforcing the Bondholders' remedies including acceleration of the Bonds, and alternatively not investigating and determining that large losses made insolvency imminent and unavoidable and that insolvency had occurred; (b) not notifying the Bondholders of the serious financial problems of the Debtor placing in jeopardy their full payment of principal and interest; and (c) concealing these serious financial problems from the Bondholders, and sending misleading and false reports to the Bondholders because of the absence of the concealed information.

131. The failure of each Master Trustee to give notices of default, to enforce the security interest when it could still be enforced, and to accelerate the Bond indebtedness, was a direct and proximate cause of the Bondholders' loss of 70% of the face amount of the Bonds, plus interest due since April 26, 2000. The failure of each Master Trustee to notify the Bondholders of the other defaults by the Debtor including the plummeting financial status that jeopardized future payment, so that they would be aware of dangers and would have the opportunity to sell their Bonds, was also a direct and proximate cause of the same.

**C.**    **Failure To Send Required Reports to the Bondholders, and To Disclose Ineligibility To Serve and Disqualification To Serve**

132. Defendants violated and breached these fiduciary duties by the acts and omissions described in Causes of Action I-II above, including but not limited to (a) not

sending required annual reports and periodic reports to the Bondholders; (b) not disclosing on the part of U.S. Bank Trust that it was not eligible to serve as Master Trustee or Trustee, and that it had conflicts of interest under applicable law; and (c) other failures to act as a prudent trustee and in the sole interests of the Bondholders.

133. The failure of each Master Trustee to send required reports to the Bondholders, so that they would be aware of dangers and would have the opportunity to sell their Bonds, and to disclose that U.S. Bank Trust was not eligible to serve as Master Trustee or Trustee and then was disqualified, was a direct and proximate cause of the Bondholders' loss of 70% of the face amount of the Bonds, plus interest due since April 26, 2000.

## CAUSE OF ACTION V – NEGLIGENCE

134. The Plaintiffs reallege and incorporate by reference all preceding paragraphs.

135. Each Master Trustee owed a duty or care to the Plaintiffs and the Class.

A.    **Failure To Protect and Continue the Security Interest, To Accelerate the Bond Indebtedness, and To Notify the Bondholders**

136. U.S. Bank Trust and SouthTrust each negligently failed to fulfill their duties toward the Plaintiffs and the Class by the acts described in paragraph 130. U.S. Bank Trust has admitted that the Master Trustee had the "duties to take all reasonable steps

necessary to ensure the maintenance of the security interest in the Collateral for the benefit and security of the holders of the Revenue Certificates" (the Bonds). (Complaint ¶ 26, *U.S. Bank Trust National Ass'n v. SouthTrust Bank & Reliance Trust Co.*, No. 2001CIV42591 (Fulton Superior Court filed Sep. 10, 2001).)   Moreover, "[a] commercial banking association acting as trustee (or a trust company acting as fiduciary servicing agent of such trustee) would have known of the need to file UCC-3 continuation statements in order to maintain a perfected security interest in the Collateral." (*Id.* ¶ 27.)

137.  In addition to duties under state law, the Trust Indenture Act makes the Master Trustee liable for its "own negligent action" (§ 77ooo(d)), and the Trust Indenture reiterates this requirement (Trust Indenture § 902).   The Master Trust Indenture says that the Master Trustee may not be relieved of "liability for its own grossly negligent action" (Master Trust Indenture § 8.1(b)), but cannot legally immunize it from liability for its own simple negligence. The Loan Agreement denies indemnification for "the Trustee's negligence." (Loan Agreement § 4.03(c).)

138.  The failure of each Master Trustee to file a UCC-3 continuation statement, or to file a new UCC-1 financing statement, and to take steps to accelerate the Bond principal, was a direct and proximate cause of the Bondholders' loss of 70% of the face amount of the Bonds, plus interest due since April 26, 2000. The failure of each Master

Trustee to notify the Bondholders of the loss of the security interest, and of other defaults under the Bond issue, so that they would be aware of dangers and would have the opportunity to sell their Bonds, was also a direct and proximate cause of the same.

**B.      Failure To Give Notices of Default, To Enforce the Security Interest, To Accelerate the Bond Indebtedness, and To Notify the Bondholders**

139.   U.S. Bank Trust and SouthTrust each negligently failed to fulfill their duties toward the Plaintiffs and the Class by the acts described in paragraph 130.

140.   The failure of each Master Trustee to give notices of default, to enforce the security interest when it could still be enforced, and to accelerate the Bond indebtedness, was a direct and proximate cause of the Bondholders' loss of 70% of the face amount of the Bonds, plus interest due since April 26, 2000.   The failure of each Master Trustee to notify the Bondholders of the other defaults by the Debtor including the plummeting financial status that jeopardized future payment, so that they would be aware of dangers and would have the opportunity to sell their Bonds, was also a direct and proximate cause of the same.

**C.      Failure To Send Required Reports to the Bondholders, and To Disclose Ineligibility To Serve and Disqualification To Serve**

141.   U.S. Bank Trust and SouthTrust each negligently failed to fulfill their duties toward the Plaintiffs and the Class by the acts described in paragraph 130.

142. The failure of each Master Trustee to send required reports to the Bondholders, so that they would be aware of dangers and would have the opportunity to sell their Bonds, and to disclose that U.S. Bank Trust was not eligible to serve as Master Trustee or Trustee and then was disqualified, was a direct and proximate cause of the Bondholders' loss of 70% of the face amount of the Bonds, plus interest due since April 26, 2000.

### CAUSE OF ACTION VI. – DECLARATORY JUDGMENT

143. The Plaintiffs reallege and incorporate herein by reference all preceding paragraphs.

144. An actual controversy has arisen and now exists relating to the rights and duties of the Plaintiffs and Defendants, as stated above.

145. The Plaintiffs desire a judicial determination of Defendants' obligations, and that Defendants jointly and severally owe the damages listed below. A declaration is necessary and proper at this time in order that the Plaintiffs may ascertain their rights and duties.

146. U.S. Bank Trust was not authorized to exist or to conduct business by the Office of the Comptroller of the Currency at the time that it allegedly became Master Trustee or at any time until after the bankruptcy on April 26, 2000. U.S. Bank Trust received its authorization dated May 17, 2000 (Exhibit 7), which listed "requirements

that must be met before the bank will be allowed to commence business." The Plaintiffs and Class request a declaratory judgment that U.S. Bank Trust is liable for the damages listed below for this reason, and was unauthorized at any time to accept fees or reimbursement of expenses for its services and must disgorge them.

147.  The Disclosure Statement in the Debtors' bankruptcy requires the Plaintiffs and the Class, in order to receive the estimated 30% of the Bond principal the bankruptcy proceeding is to pay to the Bondholders, to surrender the Bonds (Revenue Certificates) and provides for termination of the Master Indenture and Certificate Indenture and Certificates pursuant to the Disclosure Statement.  The Plaintiffs and Class request a declaratory judgment that the foregoing, and acceptance of the check sent by the bankruptcy trustee, will not waive or impair the Plaintiffs' and the Class' claims against Defendants.

## PRAYER FOR RELIEF

148.  WHEREFORE, the Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

1.  For compensatory damages against Defendants are jointly and severally, in the amount of: the 70% of the Bond principal that is not expected to be paid by the bankruptcy trustee to the Bondholders for the Plaintiffs and the Class, totaling $23,450,000, and the interest due after April 26, 2000 that was not paid and that is

owed at the 12% Georgia rate (pursuant to Promissory Note p.3) after amounts were due; plus all fees and expenses charged against funds otherwise available to the Bondholders since SouthTrust began as Master Trustee.

2.  For exemplary and punitive damages, for Defendants' fraud and misrepresentation, violation of the Trust Indenture Act, breach of fiduciary duties, and gross negligence, including but not limited to concealment of the failure to file the UCC-3 continuation statement, of the loss of secured status, of the failure to give notices of defaults, and of the defaults.

3.  For removal of the Master Trustee, and the appointment of a successor, pursuant to the Trust Indenture Act (§ 77jjj(b)(iii)).

4.  For a declaratory judgment including: that Defendants are jointly and severally liable for the 70% of the Bond principal that is not expected to be paid by the bankruptcy trustee to the Bondholders for the Plaintiffs and the Class, and for the interest due after April 26, 2000 that has not been paid at the 12% Georgia rate; that U.S. Bank Trust never qualified for valid appointment as Master Trustee or Trustee, and was not authorized by the Comptroller of the Currency to act as Master Trustee or Trustee at any time before the bankruptcy filing, and was not legally able to accept or keep any fees or reimbursements in connection with not validly serving as Master Trustee or Trustee; that SouthTrust was never validly relieved of responsibilities as

Master Trustee or Trustee under Master Trust Indenture § 8.7; that U.S. Bank Trust may not charge any legal fee or expense of this action against amounts otherwise available for distribution to the Bondholders, or of the Fulton County action; that the parties are estopped from denying the statements they have made in the Fulton Superior Court case, and their statements there are admissions; and that surrender of the Bonds (Revenue Certificates) and acceptance of a distribution in bankruptcy, and the termination of the Master Indenture and Certificate Indenture and Certificates pursuant to the Disclosure Statement, will not waive or impair the Plaintiffs' and the Class' claim against Defendants.

5. For the Plaintiffs' costs herein, pursuant to the Trust Indenture Act, 15 U.S.C. § 77ooo(e); to O.C.G.A. § 9-4-9, and other grounds.

6. For the Plaintiffs' attorneys' fees incurred herein, pursuant to the Trust Indenture Act, 15 U.S.C. § 77ooo(e); to the Promissory Note at 4; to O.C.G.A. § 13-6-11 because Defendants acted in bad faith, breached the contract in bad faith, acted in their contractual relations in bad faith, defrauded the Plaintiffs or misrepresented to them, and tortiously interfered with their contracts; have been stubbornly litigious; or have caused the Plaintiffs unnecessary trouble and expense; for fraud; pursuant to O.C.G.A. §10-1-373(b) for deceptive trade practices; and other grounds.

7. For such other and further relief as the Court deems just and appropriate.

    This 8th day of May, 2002.

Respectfully submitted,

Bird & Associates, P.C.

_____

Richard L. Brittain
Georgia Bar No.: 083275

_____

Wendell R. Bird
Georgia Bar No.: 057875

Jonathan T. McCants
Georgia Bar No.: 480485

Bird & Associates, P.C.
1150 Monarch Plaza
3414 Peachtree Road, N.E.
Atlanta, Georgia 30326
(404) 264-9400
Facsimile (404) 365-9731

## EXHIBITS TO COMPLAINT

**Exhibit 1.  Trust Indenture (Nov. 1, 1993) between Master Trustee and the Authority**

**Exhibit 2.  Master Trust Indenture (Nov. 1, 1993) between Master Trustee and Debtors**

**Exhibit 2A. First Supplemental Master Trust Indenture (Nov. 1, 1993) between Master Trustee and Debtors**
**(the Trust Indenture, Master Trust Indenture, and First Supplemental Master Trust Indenture are jointly referred to as the "Trust Indenture")**

**Exhibit 3.  Loan Agreement (Nov. 1, 1993) between Debtors and the Authority**

**Exhibit 4.  Promissory Note and Form of Promissory Note (Nov. 1, 1993) between Debtor and Master Trustee**

**Exhibit 5.  UCC-1 Financing Statements (perfecting secured status) (Dec. 22, 1993)**

**Exhibit 6.  Notice of Event of Default (May 12, 2000)**

**Exhibit 7.  Comptroller of the Currency, Conditional Approval # 397 (May 17, 2000 and June 2000)**

**Exhibit 8.  Answer of Reliance Trust Co. (Nov. 29, 2001)**

MAY02DOC/TRICOMPLAINT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **GRAY MURRAY, SAM RAMSEY,** )<br>**AND KENNETH HENSON, MIRIAM** )<br>**LEWIS, AND BUD HARTLEY,** )<br>Individually and as Representatives of a )<br>Class of Certificate Holders of Tri-City )<br>Hospital Authority Revenue Certificates, )<br>         **Plaintiffs** )<br>v. )<br>    )<br>**U.S. BANK TRUST NATIONAL** )<br>**ASSOCIATION, AND SOUTHTRUST** )<br>**BANK (f/k/a SouthTrust Bank, N.A.),** )<br>         **Defendants** )<br>    ) | CIVIL ACTION NO._____<br><br>COMPLAINT - CLASS ACTION |

## DEMAND FOR JURY TRIAL

Plaintiffs hereby make demand for a jury trial in this action.

This 8th day of May, 2002.

Respectfully submitted,

Bird & Associates, P.C.

Richard L. Brittain
Georgia Bar No.: 083275

Wendell R. Bird
Georgia Bar No.: 057875

Jonathan T. McCants
Georgia Bar No.: 480485

Bird & Associates, P.C.
1150 Monarch Plaza
3414 Peachtree Road, N.E.
Atlanta, Georgia 30326
(404) 264-9400
Facsimile (404) 365-9731

ORIGINAL

FILED IN CLERK'S OFFICE

MAY  8 2002

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| GRAY MURRAY, SAM RAMSEY, | ) | **1 02-CV-1244** |
| KEN HENSON, MIRIAM LEWIS, AND | ) | CIVIL ACTION NO._____ |
| BUD HARTLEY, Individually and as | ) | |
| Representatives of a Class of Certificate | ) | COMPLAINT - CLASS ACTION |
| Holders of Tri-City Hospital Authority | ) | |
| Revenue Certificates, | ) | |
| **Plaintiffs** | ) | |
| v. | ) | |
| U.S. BANK TRUST NATIONAL | ) | |
| ASSOCIATION, AND SOUTHTRUST | ) | |
| BANK (f/k/a SouthTrust Bank, N.A.), | ) | |
| **Defendants** | ) | WITH JURY DEMAND |

### EXHIBITS TO COMPLAINT

**Exhibit 1.**  Trust Indenture (Nov. 1, 1993) between Master Trustee and the Authority

**Exhibit 2.**  Master Trust Indenture (Nov. 1, 1993) between Master Trustee and Debtors

**Exhibit 2A.** First Supplemental Master Trust Indenture (Nov. 1, 1993) between Master Trustee and Debtors (the Trust Indenture, Master Trust Indenture, and First Supplemental Master Trust Indenture are jointly referred to as the "Trust Indenture")

**Exhibit 3.**  Loan Agreement (Nov. 1, 1993) between Debtors and the Authority

**Exhibit 4.**  Promissory Note and Form of Promissory Note (Nov. 1, 1993) between Debtor and Master Trustee

**Exhibit 5.**  UCC-1 Financing Statements (perfecting secured status) (Dec. 22, 1993)

**Exhibit 6.**  Notice of Event of Default (May 12, 2000)

**Exhibit 7.**  Comptroller of the Currency, Conditional Approval # 397 (May 17, 2000 and June 2000)

**Exhibit 8.**  Answer of Reliance Trust Co. (Nov. 29, 2001)



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

TRUST INDENTURE


Dated as of November 1, 1993


between


TRI-CITY HOSPITAL AUTHORITY


and


BANK SOUTH, N.A.

as Trustee


Relating to $39,140,000
Tri-City Hospital Authority
Revenue Certificates,
Series 1993

<u>TABLE OF CONTENTS</u>

ARTICLE I        DEFINITIONS

  Section 101.  Certain Definitions........................ 6
  Section 102.  Certain Rules of Interpretation...........16

ARTICLE II       TERMS, EXECUTION, DELIVERY AND
      REGISTRATION OF SERIES 1993 CERTIFICATES

  Section 201.  Designation of Series 1993 Certificates....18
  Section 202.  Terms of Series 1993 Certificates......... 18
  Section 203.  Form of Series 1993 Certificates..........20
  Section 204.  Execution of Series 1993 Certificates......31
  Section 205.  Authentication of Series 1993
         Certificates...............................31
  Section 206.  Mutilated, Lost, Stolen or
         Destroyed Certificates.....................31
  Section 207.  Registration..............................32
  Section 208.  Ownership, Transfer and Exchange
         of Certificates............................32

ARTICLE III      REDEMPTION OF SERIES 1993 CERTIFICATES
      BEFORE MATURITY

  Section 301.  Optional Redemption of Series 1993
         Certificates...............................33
  Section 302.  Extraordinary Redemption..................33
  Section 303.  Mandatory Sinking Fund Redemption.........33
  Section 304.  Selection of Certificates to be
         Redeemed...................................34
  Section 305.  Partially Redeemed Series 1993
         Certificates...............................35
  Section 306.  Notice of Redemption......................35
  Section 307.  Effect of Redemption Call.................35
  Section 308.  Cancellation and Destruction of
         Series 1993 Certificates...................36

ARTICLE IV       CUSTODY, INVESTMENT AND APPLICATION
      OF PROCEEDS OF SERIES 1993 CERTIFICATES;
      CONSTRUCTION FUND

  Section 401.  Application of Proceeds of Series
         1993 Certificates..........................37
  Section 402.  Construction Fund.........................37
  Section 403.  Establishment of Completion Date..........39
  Section 404.  Availability of Requisitions
         and Certificates...........................40
  Section 405.  Investment of Construction Fund Moneys.....40

Page

ARTICLE V      CREATION OF CERTAIN FUNDS

    Section 501.  Sinking Fund................................41
    Section 502.  Arrangements for Payment ..................41
    Section 503.  Nonpresentment of Series 1993
                  Certificates...............................42
    Section 504.  Repayment to the Institution from
                  Certain Funds..............................42
    Section 505.  Debt Service Reserve Fund..................42
    Section 506.  Substitution of Reserve Fund Letter
                  of Credit .................................44

ARTICLE VI     SECURITY FOR DEPOSITS; INVESTMENTS

    Section 601.  Security for Deposits......................46
    Section 602.  Investments................................46

ARTICLE VII    PARTICULAR COVENANTS

    Section 701.  Payment of Principal, Interest
                  and Premium................................47
    Section 702.  Institution Covenants......................47
    Section 703.  Covenant Against Encumbrances..............48
    Section 704.  Recording and Filing.......................48
    Section 705.  Further Instruments and Actions............48
    Section 706.  Arbitrage Covenant.........................48
    Section 707.  [Intentionally Omitted]....................49

ARTICLE VIII   EVENTS OF DEFAULT AND REMEDIES

    Section 801.  Events of Default; Acceleration
                  of Maturity................................50
    Section 802.  Notice of Default..........................52
    Section 803.  Termination of Proceedings by
                  Trustee....................................52
    Section 804.  Right of Certificate Owners to
                  Control Proceedings........................52
    Section 805.  Right of Certificate Owners to
                  Institute Suit.............................52
    Section 806.  Suits by Trustee...........................53
    Section 807.  Remedies Cumulative........................53
    Section 808.  Waiver of Default..........................53
    Section 809.  Application of Moneys After Default........54

ARTICLE IX     CONCERNING THE TRUSTEE

    Section 901.  Acceptance by Trustee......................56
    Section 902.  Performance of Duties......................56
    Section 903.  Instruments Upon Which Trustee
                  May Rely...................................59
    Section 904.  Trustee not Responsible for
                  Recitals and Other Matters.................60

Page

Section 905.    Trustee May Acquire Series 1993
                Certificates...............................60
Section 906.    Intervention by Trustee....................60
Section 907.    Compensation of Trustee....................60
Section 908.    Qualification of Trustee...................61
Section 909.    Resignation of Trustee and
                Appointment of Successor...................62
Section 910.    Concerning the Successor Trustee...........63
Section 911.    Merger or Consolidation of Trustee.........64
Section 912.    Retention of Financial Statements..........64
Section 913.    Trustee May Act Through Agents.............64

ARTICLE X       MANNER OF EVIDENCING OWNERSHIP OF
                CERTIFICATES; MEETINGS OF CERTIFICATE
                OWNERS

Section 1001.   Ownership..................................65
Section 1002.   Purposes for which Certificate
                Owners' Meetings may be Called.............65
Section 1003.   Place of Meetings of
                Certificate Owners.........................66
Section 1004.   Call and Notice of Owners of Series
                1993 Certificates' Meetings................66
Section 1005.   Determination of Voting Rights; Conduct
                and Adjournment of Meetings................66
Section 1006.   Counting Votes and Recording Action
                of Meetings................................67
Section 1007.   Revocation by Certificate Owners...........68

ARTICLE XI      DEFEASANCE; UNCLAIMED MONEYS

Section 1101.   Discharge of Indebtedness..................69
Section 1102.   Termination of Authority's Liability.......70
Section 1103.   Unclaimed Moneys...........................70

ARTICLE XII     SUPPLEMENTAL INDENTURES; LOAN AGREEMENTS

Section 1201.   Supplemental Indentures Not Requiring
                Consent of Certificate Owners..............71
Section 1202.   Supplemental Indentures Requiring
                Consent of Certificate Owners..............72
Section 1203.   Notice.....................................72
Section 1204.   Supplemental Indenture to Modify
                This Indenture.............................73
Section 1205.   Supplemental Loan Agreement................73
Section 1206.   Supplements to the Master Indenture........73
Section 1207.   Trustee Consent to Amendments..............74

Page

ARTICLE XIII    MISCELLANEOUS PROVISIONS

    Section 1301.    Benefit of Indenture.......................75
    Section 1302.    Severability..............................75
    Section 1303.    Certificates Payable Solely From
                     Revenues Pledged, not Binding
                     on Individuals............................75
    Section 1304.    Notices...................................76
    Section 1305.    [INTENTIONALLY OMITTED]...................76
    Section 1306.    Payments Due on Saturdays, Sundays,
                     Holidays, etc.............................76
    Section 1307.    Applicable Law............................76
    Section 1308.    Counterparts..............................76
    Section 1309.    Headings and Captions.....................77

THIS TRUST INDENTURE, dated as of the first day of November, 1993 (the "Indenture"), between TRI-CITY HOSPITAL AUTHORITY (the "Authority"), a public body corporate and politic organized and existing under the laws of the State of Georgia, and BANK SOUTH, N.A., Atlanta, Georgia, a national banking association duly organized and existing under and by virtue of the laws of the United States of America, and having power and authority to accept and execute trusts and having its principal corporate trust office in the City of Atlanta, Georgia (the "Trustee");

W I T N E S S E T H:

WHEREAS, the Authority is a public body corporate and politic created by the Hospital Authorities Law (now codified, as amended, at O.C.G.A. Section 31-7-70, et seq.) (the "Act"), and activated pursuant to a joint resolution of the governing bodies of the Cities of College Park, East Point and Hapeville, Georgia adopted on October 7, 1958; and

WHEREAS, the Authority is authorized and empowered by the Act to acquire by purchase, lease or otherwise and to operate "projects", which, within the meaning of the Act, include hospitals and doctors office buildings; to construct, reconstruct, improve, alter and repair "projects"; and to issue and sell revenue anticipation certificates for the purpose of paying all or any part of the cost of the acquisition, construction, alteration, repair, modernization, and other charges incident thereto in connection with any "project" and for the purpose of refunding outstanding revenue anticipation certificates; and

WHEREAS, the Authority has been and is now legally created, existing and operating in accordance with all of the terms and provisions of the Act and will continue to comply with all of the requirements thereof;

WHEREAS, the Authority currently owns certain medical facilities located in East Point, Georgia known as South Fulton Medical Center (the "Medical Center"), which facilities are leased to South Fulton Medical Center, Inc., a nonprofit corporation organized and existing under the laws of the State of Georgia (the "Institution"), pursuant to a Lease Agreement, dated as of July 1, 1989 (the "Lease"); and

WHEREAS, the Institution desires to purchase the Medical Center from the Authority, and has requested that the Authority assist in the financing of such acquisition and the financing of the cost of certain additions, extensions and improvements to the Medical Center, and the cost of reimbursing the Institution for certain improvements heretofore made by the Institution to the Medical Center (the "Project"), which Project is more fully described in the Loan Agreement hereinafter referred to; and

[-1-]

WHEREAS, the Authority has determined that assisting the Institution in the financing of the acquisition of the Medical Center and the financing of the Project may be best accomplished through the issuance by the Authority of its Revenue Certificates, Series 1993 (the "Series 1993 Certificates"), in the aggregate principal amount of $39,140,000; and

WHEREAS, the proceeds of the sale of the Series 1993 Certificates will be loaned to the Institution (the "Loan") pursuant to a Loan Agreement, dated as of November 1, 1993 (the "Agreement"), between the Authority and the Institution, specifically for the purpose of (i) financing the acquisition of the Medical Center by the Institution from the Authority, (ii) financing and reimbursing the Institution for the cost of certain additions, extensions and improvements to be made or heretofore made to the Medical Center, (iii) funding the Debt Service Reserve Fund created hereunder in an amount equal to the Reserve Requirement (as hereinafter defined), and (iv) paying all or a portion of the costs of issuing the Series 1993 Certificates; and

WHEREAS, in consideration of such loan and in order to provide for the repayment of such Loan, the Institution has agreed in the Agreement that it will execute and deliver to the master trustee, on behalf of the Authority, its 1993 Master Note, dated the date of issuance of the Series 1993 Certificates (the "Promissory Note") issued pursuant to the Master Trust Indenture, dated as of November 1, 1993 (the "Original Master Indenture"), between and among the Institution, South Fulton Medical Center Foundation, Inc. ("SFMCF"), South Fulton Medical Arts Center, Inc. ("SFMAC"), South Atlanta Diagnostic Cardiology, Inc. ("SADC"), South Fulton Health Care Center, Inc. ("SFHCC"), Georgia International Health Alliance, Inc. ("GIHA") (collectively, the "Initial Obligated Group") and Bank South, N.A., Atlanta, Georgia, as trustee (the "Master Trustee"), as supplemented by the First Supplemental Master Trust Indenture, dated as of November 1, 1993 (the "First Supplemental Master Indenture"), between and among the Initial Obligated Group and the Master Trustee (the Original Master Indenture, as so supplemented, the "Master Indenture"); and

WHEREAS, in order to secure the payment of the Series 1993 Certificates, the Authority will pledge all of its right, title and interest in and to the Agreement and the Promissory Note, including its right to receive certain payments pursuant to the Promissory Note, to the Trustee pursuant to this Indenture; and

WHEREAS, the issuance and sale of the Series 1993 Certificates, the use of the proceeds of the Series 1993 Certificates to finance the acquisition of the Medical Center and to finance and reimburse the Institution for the cost of the Project, the execution, delivery and performance of this Indenture and all other acts and things required under the Constitution and laws of the State of Georgia to make this Indenture a valid and binding obligation in accordance with its terms are authorized by

-2-